**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LAN GLOBAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| ALCHEMY TELCO SOLUTIONS US, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ALCHEMY TELCO SOLUTIONS US, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| LAN GLOBAL, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No. 22-CV-11732-AK

Related Action
Civil Action No. 22-CV-11763-AK

<u>**MEMORANDUM AND ORDER ADOPTING REPORT AND RECOMMENDATION
ON ALCHEMY'S MOTION FOR SUMMARY JUDGMENT and
MOTION TO STRIKE PORTIONS OF EXPERT REPORTS**</u>

**ANGEL KELLEY, D.J.**

This case arises out of a failed business relationship.  Plaintiff Lan Global, Inc. ("Lan

Global") and Defendant Alchemy Telco Solutions US, LLC ("Alchemy") are players in the used-

electronics marketplace selling used smartphones and other electronic devices to consumers.

They entered into a contract, and after Lan Global failed to perform under the contract, Lan

Global sued Alchemy for, among other claims, unjust enrichment and breach of the implied

covenant of good faith and fair dealing. [Dkts. 1, 5]. Alchemy in turn sued Lan Global for breach of contract. [Related Case 1:22-cv-11763-AK, Dkt. 1]. Alchemy filed a Motion to Dismiss, [Dkt. 28]. This Court adopted Magistrate Judge Levenson's <u>Report and Recommendation</u> and dismissed several counts of Lan Global's First Amended Complaint. [Dkt. 59].

Currently before the Court are Alchemy's Partial Motion for Summary Judgment as to Lan Global's liability and its Motion to Strike Lan Global's Expert Testimony. [Dkts. 82, 87]. Judge Levenson issued a <u>Report and Recommendation</u> ("the Report") that Alchemy's Partial Motion for Summary Judgment be granted in full but that Lan Global only be responsible for Alchemy's legal fees to the extent that they were incurred while defending against claims brought by Lan Global. [Dkt. 130]. Judge Levenson also recommended that Alchemy's Motion to Strike be granted as to one of Lan Global's experts. [<u>Id.</u>].

Lan Global objected to the Report. [Dkt. 135]. After <u>de novo</u> review and for the reasons that follow, this Court **ADOPTS IN PART** the <u>Report and Recommendation</u> and **GRANTS** Alchemy's Motion for Summary Judgment as to liability and **DENIES** Alchemy's Motion to Strike, with the limitations explained herein.

## I.    BACKGROUND

The Court adopts the relevant allegations recited in the Report. [Dkt. 135 at 1-11]. In summary, Lan Global and Alchemy first collaborated in 2021. At that time, Alchemy arranged to purchase used iPhones from Apple, which it sold to a third party, XTENN, who then sold many of the iPhones to Lan Global. [Dkt. 91-17 at ¶¶ 10-14]. The purchase orders between Alchemy and XTENN and between XTENN and Lan Global specified the condition, or "Grade",

of the devices to be sold/purchased.  [Id. at ¶¶ 10-15].  The letter "Grades" referred to the cosmetic condition of the device.  [Dkt. 85-7 at 4].

In January 2022, Lan Global and Alchemy entered into a Master Purchase Agreement ("MPA") which replaced XTENN's role with the following intended procedure: Alchemy would invite Lan Global to submit a bid on used smartphones.  If Lan Global submitted a bid and Alchemy accepted, Alchemy would purchase the used smartphones from Apple and sell them to Lan Global at the bid price.  [Dkt. 85-13 at ¶ 3].  The bids were to be submitted using an associated Order Form.  [Id.].  The MPA included the following express disclaimer:

> **Goods; Disclaimer of Warranties**. Alchemy makes no representations or warranties regarding the Goods, their condition or specifications or the Goods' compliance with the laws of any particular country. Any pictures of the Goods on the Website are for illustrative purposes only. Packaging of the Goods may vary. Goods are sold on an "as-is" basis. To the fullest extent permitted by law, Alchemy hereby disclaims any and all representations and warranties, whether express or implied, including any warranties or conditions of TITLE, NON-INFRINGEMENT, MERCHANTABILITY, or FITNESS FOR A PARTICULAR PURPOSE. You are solely responsible for determining the appropriateness of Goods for your resale.

[Dkt. 85-13 at ¶ 5].

The MPA also included an Integration Clause, which stated that the MPA reflects the "entire understanding" between Lan Global and Alchemy and a disclaimer that Lan Global "has not relied on any statement, promise or representation, assurance or warranty that is not set out in this Agreement or Order Form hereunder."  [Id. at ¶ 16].  Finally, the MPA contained an Indemnification Clause, which stated in part:

> [Lan Global] agrees to indemnify and hold harmless and defend Alchemy . . . against all actual and alleged claims, including direct claims, related to injuries to persons (including death), property damages, losses, and expenses, including court costs and reasonable attorney's fees, arising out of, or resulting from, Lan Global]'s performance, non-performance or breach of this Agreement, including any causes of action based upon common, constitutional, or statutory law, or

based in whole or in part, upon allegations of negligent or intentional acts on the
part of [Lan Global] . . . .

[Id. at ¶ 13].

     The Order Form associated with the MPA stated that "[t]he product for this exclusive
program will be devices traded as 'Working' condition through the Apple trade in program."
[Dkt. 85-13 at 10] (internal quotation marks in original).  The Order Form also specified the
following "exhaustive list" of permissible reasons for requesting a return:

- Device is FMiP, MDM, iCloud Locked
- Device does not data wipe
- Device has a smashed enclosure/housing
- Cracks in the viewable area only when the % of these devices make up
  >2% of total units sold
- Cracks in the non-viewable area only when the % of these devices make up
  >3% of the total units sold

[Id. at 11].  Unlike the XTENN order forms, the Order Form associated with the MPA did not
specify that the devices conform to any "Grade" or mix of "Grades."

     After several months, Lan Global fell behind in its payments to Alchemy.  [Dkt. 91-17 at
¶ 38].  Meanwhile, Lan Global submitted return requests, which Alchemy processed according to
the terms of the MPA.  [Dkt. 91-17 at ¶ 44-45].  In response to these requests, Alchemy's
Director of Sales asserted in an email that "working" grade devices are "the same condition that
[Lan Global has] been buying all along with us," attaching an Alchemy document that refers to
"Working (W) Grade," in part, as an "organic blend of cosmetic grades including A, B and C."
[Dkt. 123-3 at 71-73].  Eventually, Alchemy secured other buyers for the devices it sourced on
behalf of Lan Global.  [Dkt. 91-17 at ¶ 43].

     Six months after the parties signed the MPA, Alchemy served Lan Global with demands
for indemnification under the MPA.  [Dkt. 91-17 at ¶¶ 46-47].  Several months later, Lan Global
sued Alchemy alleging that Alchemy was obligated under the MPA to provide it with a

particular proportion of Grade A, Grade B, and Grade C iPhones, and that instead it provided

Lan Global with mostly Grade C iPhones.  [Dkts. 1, 5].  Alchemy in turn alleged that neither the

MPA nor the Order Form specified what mix of Grades Alchemy was required to provide, and

Lan Global breached the MPA when it refused to pay for orders whose corresponding bids

Alchemy had accepted.  [Related Case 1:22-cv-11763-AK, Dkt. 1].

## II.     STANDARDS OF REVIEW

### A.     Review of a Magistrate's Report and Recommendation

Federal Rule of Civil Procedure 72(b)(3) requires the court to review "de novo any part

of the magistrate judge's disposition that has been properly objected to."  "Conclusory objections

that do not direct the reviewing court to the issues in controversy" do not trigger Rule 72(b).

Velez-Padro v. Thermo King De P.R., Inc., 465 F.3d 31, 32 (1st Cir. 2006).  "Parties must take

before the magistrate, 'not only their "best shot" but all of their shots.'"  Borden v. Sec'y of

Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987) (quoting Singh v. Superintending Sch.

Comm. of City of Portland, 593 F. Supp. 1315, 1318 (D. Me. 1984)).  Therefore, a party is "not

entitled to a de novo review of an argument never raised" before the magistrate judge.  Borden,

836 F.2d at 6.

Where no objections have been filed to a report and recommendation, the court is not

required to engage in de novo review, or even in "some lesser standard" of review.  Thomas v.

Arn, 474 U.S. 140, 149 (1985); see also 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3).

However, the court is encouraged "to afford some level of review to dispositive legal issues

raised by the report."  Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987).

### B.   Summary Judgment

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine dispute as to any material fact and the mov[ing party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must consider (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).

A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted).  However, "the non-moving party may not simply 'rest upon mere allegations or denials of his pleading,' but instead must 'present affirmative evidence.'" Adler v. Her Campus Media, LLC, 411 F. Supp. 3d 121, 126 (D. Mass. 2019).

## III.   ANALYSIS

Lan Global objects to Judge Levenson's recommendation that the Court enter summary judgment for Alchemy as to liability on all remaining counts.

A.      **Summary Judgment on Alchemy's Claims as to Liability**

Alchemy moves for summary judgment as to liability for its breach of contract and indemnification claims.  Alchemy contends that the MPA required only that Alchemy provide Lan Global with devices in "working condition" and did not contain any promises or assurances as to the Grades or mix of Grades per allotment.  As it is undisputed that Alchemy did provide Lan Global with functional devices matching Lan Global's bids, Alchemy submits that Lan Global breached the MPA when it failed to make the appropriate payments for the devices.

Lan Global responds that the phrase "'Working' condition" referred to the Grade of the devices, and that at best the contract is ambiguous as to the condition of the devices that Alchemy was obligated to procure.  Therefore, Lan Global asserts that extrinsic evidence is necessary to show the parties' expectations and understanding when they entered into the MPA.  According to Lan Global, the evidence supports its affirmative defenses of excuse and prevention and shows that Alchemy failed to mitigate damages.

For the reasons that follow, the Court agrees with Judge Levenson's findings and conclusions of law and therefore **ADOPTS** his recommendation to **GRANT** Alchemy's Motion for Summary Judgment as to liability, except insofar as it holds Lan Global responsible for Alchemy's costs associated with prosecuting its own claims.

1.      <u>Breach of Contract</u>

A breach of contract claim requires a plaintiff to demonstrate "that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." <u>Bulwer v. Mount Auburn Hosp.</u>, 473 Mass. 672, 690 (2016).  "A court interpreting a contract must first assess whether the

contract is ambiguous." Sonoiki v. Harvard Univ., 37 F.4th 691, 703–04 (1st Cir. 2022) (quoting Farmers Ins. Exch.v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011)).  Whether a contractual term is ambiguous is a question of law that turns on whether the language "is reasonably prone to different interpretations or susceptible to differing, but nonetheless plausible, constructions." Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999) (internal quotation marks omitted).  To determine whether a term is ambiguous, the court looks to both "the contested language and to the text of the contract as a whole." Balles v. Babcock Power Inc., 476 Mass. 565, 572 (2017); see also Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) ("Accepted canons of construction forbid the balkanization of contracts for interpretive purposes.").  Further, "[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001).

Judge Levenson found, and this Court agrees, that there is no material dispute that the parties were bound by the MPA, that Lan Global bid on devices which Alchemy then sourced, Lan Global failed to make payments on all the devices it had bid on, and Alchemy sold the remaining devices at a loss.  [Dkt. 91-17 at ¶¶ 29-30, 34, 36-38, 43, 51-52; Dkt. 124 at ¶¶ 29-30, 34, 36-38, 43, 51-52].  Alchemy submits that the inquiry ends here, and Lan Global is liable for the losses incurred by its breach.

However, Lan Global asserts three affirmative defenses to refute liability.  First, Lan Global contends that it was excused from performing under the contract because Alchemy failed to provide it with the mix of device Grades envisioned by the parties when they signed the MPA.  Second, Lan Global asserts that because of the inferior mix of Grades, Lan Global was unable to

sell the devices and was therefore unable to perform under the MPA.  Third, Lan Global submits that Alchemy failed to mitigate damages.

As to the first defense, the dispositive question is whether "'Working' condition" as used by the MPA is ambiguous, thus permitting Lan Global to supplement the record with extrinsic evidence regarding the parties' expectations.  As to the second defense, the dispositive question is whether Alchemy's performance under the contract was wrongful and created the environment such that Lan Global was unable to perform.  As to the third defense, that is a question of damages that is not yet ripe.

a)     <u>First Affirmative Defense: Excuse</u>

Lan Global's primary defense is that it was excused from performing under the MPA because Alchemy breached its implied covenant of good faith and fair dealing when, in violation of the parties' understanding, it provided Lan Global with a disproportionate number of lower-grade devices.

"The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 411 Mass. 451, 471, 583 N.E.2d 806 (1991) (quotations and citations omitted).  A party that violates its obligation of good faith and fair dealing cannot claim contract damages if and when the other party breaches the contract at issue. <u>See</u> <u>Hawthorne's, Inc. v. Warrenton Realty, Inc.</u>, 414 Mass. 200, 210–211, 606 N.E.2d 908 (1993) (party that "had committed a breach of the [contract] by violating its obligation of good faith and fair dealing" was "not entitled to contract damages").

However, "the implied covenant of good faith and fair dealing does not create rights or duties beyond those the parties agreed to when they entered into the contract." <u>R.R. Ave. Props.,</u>

9

LLC v. Acadia Ins. Co., 37 F.4th 682, 689 (1st Cir. 2022) (citations omitted).  For Lan Global to be excused from performing, it must show that Alchemy had a duty under the MPA to provide Lan Global with a more proportionate mix of device Grades.

To begin, the MPA does not anywhere refer to the Grades of devices that would comprise each allotment.  However, the MPA does stipulate that "[t]he product for this exclusive program will be devices traded as 'Working' condition through the Apple trade in program."  [Dkt. 85-13 at 10] (internal quotation marks in original).  There is no definition of "'Working' condition."

Unambiguous words in a contract "must be understood in their usual and ordinary sense" and a contract as a whole "should be interpreted in a reasonable and practical way, consistent with its language, background, and purpose."  Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC, 16 F.4th 304, 308 (1st Cir. 2021) (internal quotations marks omitted).  On its face, the term "working condition" refers to the functionality of the device, not to its cosmetic appearance.  Whether or not a device "works" is not ambiguous.

But one could infer from the phrasing that "working" is a term of art used by the Apple trade-in program, which could give rise to some degree of ambiguity.  Therefore, one must look to the contract in its entirety to determine whether the term "working" should be understood in a way that departs from its usual and ordinary meaning.

The Order Form associated with the MPA included an "exhaustive list" of permissible reasons for requesting a return.  [Dkt. 85-13 at 11].  These reasons included functional problems (the device is locked, does not data wipe, or the enclosure/housing is smashed) and cosmetic problems (the device has specified cracks).  Notably, devices were only eligible to be returned for cracks if the cracks in the viewable area exceeded

2% of total units sold or cracks in the non-viewable area exceeded 3% of the total units sold.  Id.

The logical conclusion is that the MPA envisioned that the devices must be functional, but that they could possess a mix of cosmetic problems.  Rather than mandate the proportion of Grades, the MPA specified that cracked devices could be returned if they exceeded a certain percentage of all units sold.  Stated differently, the Order Form shows that the MPA distinguished between functional and cosmetic problems: any devices with functional problems could be returned, but devices with cosmetic problems could only be returned if they comprised a certain percent of the allotment which was determined according to the severity of the damage.

The MPA also contained a General Disclaimer—wherein Alchemy expressly disclaimed responsibility as to the devices' "condition or specifications" and their "merchantability," and stated that goods were sold "on an 'as-is' basis," [id. at ¶ 5]—and an Integration Clause—which stated that the MPA reflected the "entire understanding" between the parties and that Lan Global "has not relied on any statement, promise or representation, assurance or warranty that is not set out in this Agreement or an Order Form hereunder," [id. at ¶ 16].

When read together with the "exhaustive list" of permissible reasons for a return, these clauses show that, under the plain language of the MPA, Lan Global agreed to accept all devices "as-is" with the exception of nonfunctional devices and devices with cracks to the viewable or non-viewable area if they exceeded a specified proportion of the total allotment.

Returning to the disputed language, it is now readily apparent that the phrase "'Working' condition" is not ambiguous.  Within the framework of the MPA as a whole, "'Working' condition" is clearly understood to mean "functional."  Under the MPA, Alchemy was obligated to provide Lan Global with functional, or "working," devices.  The MPA states that the products bought and sold under the program would be traded as "'Working' condition."  [Dkt. 85-13 at 10].  Interpreting "working" according to its usual and ordinary sense is consistent with the language of the Order Form, the General Disclaimer, and the Integration Clause.

As the MPA unambiguously did not require Alchemy to provide Lan Global with an even mix of device Grades, Lan Global was not excused from making payments.  See, e.g. R.R. Ave. Props., 37 F.4th at 689 ("Because the Policy language is unambiguous, we cannot vary from the text of the Policy by looking to custom and practice."); Somerset Sav. Bank v. Chi. Title Ins. Co., 420 Mass. 422, 649 N.E.2d 1123, 1127 (1995) ("Absent ambiguous contractual language in the policy, custom and practice evidence cannot be used to vary the provisions of the policy.").

b)      Second Affirmative Defense: Prevention

The weakness of Lan Global's first affirmative defense dooms its second.  Lan Global submits that it was prevented from performing due to Alchemy's failure to meet their mutually agreed-upon expectations as to the particular proportion of Grade A, Grade B, and Grade C iPhones to be provided.  Lan Global avers that it was unable to find buyers for the damaged devices and therefore was unable to pay Alchemy.  This defense is based on the theory, known as the "prevention doctrine," which stems from "the long-established principle of law that one should not be able to take advantage of his or her own wrongful act."  13 Williston on Contracts

§ 39:6 (2000).  See also Downing v. Omnicare, Inc., 299 F. Supp. 3d 218, 230 (D. Mass. 2017)

("One who prevents the performance of a contract cannot take advantage of its

nonperformance.") (alteration omitted) (quoting Winchester Gables, Inc. v. Host Marriott Corp.,

70 Mass. App. Ct. 585, 875 N.E.2d 527, 536 (2007)).

      As previously discussed, Alchemy sufficiently performed under the terms of the contract.

Lan Global's defense relies on the assumption that Alchemy wrongfully interfered with or

hindered Lan Global's ability to perform by providing it with inferior devices.  Lan Global cites

Winchester Gables, supra, in support of its position.

      Winchester Gables concerned a dispute between two parties to a purchase and sale

agreement.  The agreement stipulated that under certain circumstances, resale of the property

would trigger additional compensation for the original seller ("Seller").  However, the agreed-

upon method for calculating the additional compensation was based off the future resale price,

and therefore did not contemplate the scenario where the property would be included in an

undifferentiated portfolio sale.  The original buyer ("Buyer") subsequently sold the property as

part of an undifferentiated portfolio sale.  As there was no specific sale price associated with the

property, the Buyer claimed that the contingency triggering additional compensation for the

Seller was not met.  The lower court found in favor of the Buyer.

      The appellate court reversed, finding that both parties were bound by the terms of the

contract.  First, the court held that, despite the contract not contemplating an undifferentiated

portfolio sale, the terms of the contract were unambiguous and did not provide a basis for

admitting evidence regarding earlier negotiations.  Id., 70 Mass. App. Ct. 585, 592-93, 875

N.E.2d 527, 533-34 (2007)).  The court referred to the integration clause and noted that even if

the parties (wrongly) anticipated that the property would be held as a single-purpose entity, "that

anticipation was never made a part of the agreement reflecting the contract between them." Id. at 593, [N.E.2d 534].

Second, the court held that the term used in the contract to calculate the contingent purchase price was also unambiguous. The court explained that the Buyer "could structure a sale that would permit application of the formula it had agreed to use, or it could structure the sale in a way that prevented it from so doing. That it chose the latter did not render ambiguous an otherwise clear contract term." Id. at 594 [N.E.2d 535]. Simply put, the Buyer "cannot argue that the term is harsh or ambiguous when it created the circumstances that it now argues caused the harshness or ambiguity." Id. at 597 [N.E.2d 536].

Ultimately, the court found that the Buyer was in breach of contract, because, due to its structuring of the undifferentiated portfolio sale, it did not provide the contingency calculation required under the agreement. This is the holding upon which Lan Global hangs its hat.

Winchester Gardens is illustrative, although not, perhaps, in the way that Lan Global intended. In that case, the court grounded its analysis in the express terms of the contract. The court held both parties to account. The parties could have negotiated for a formula based on a different predicate. Id. at 594 [N.E.2d 535]. The fact that they did not anticipate this outcome did not retroactively create ambiguity in the contract. Crucially, the court found that the Buyer had breached the express terms of the contract, and impossibility was not a viable defense where the Buyer had created the impossibility.

Here, the parties are similarly accountable for the negotiated terms contained in their contract. As harsh as it may seem, whether or not they anticipated that Alchemy would provide an even mix of device Grades does not create ambiguity where the language is clear. Lan Global argues that Alchemy created conditions such that Lan Global could not sell the lower-grade

devices.  In <u>Winchester Gardens</u>, the court held that the Buyer was within its rights to sell the property as part of an undifferentiated portfolio, even though it was not contemplated by the contract.  However, it then had to pay the penalty for non-performance when it was unable to calculate the contingency sale price.  In this case, Alchemy was within its rights to procure and provide devices in accordance with the MPA, and, even if Lan Global's expectations regarding the quality of devices were not met, Lan Global is responsible for its failure to pay.

c)     <u>Third Affirmative Defense: Failure to Mitigate</u>

Lan Global asserts that Alchemy did not mitigate its damages when it became clear that Lan Global had stopped making payments on the devices it had bid on.  While Lan Global is correct that there are material facts in dispute regarding this defense, that is irrelevant.  Alchemy only moved for summary judgment as to liability, not damages.  Lan Global's affirmative defense of failure to mitigate will surely be the basis of much debate when the question of damages becomes ripe.

2.     <u>Indemnification</u>

Alchemy moves for summary judgment, as to liability only, on its claim that the indemnification clause in the MPA applies to attorney's fees and other expenses incurred by Alchemy in connection with its prosecution and defense of these two lawsuits.  [Dkt. 91-16 at 18-20].  As stated earlier, the MPA's indemnification clause reads, in pertinent part:

> [Lan Global] agrees to indemnify and hold harmless and defend Alchemy . . . against all actual and alleged claims, including direct claims, related to injuries to persons (including death), property damages, losses, and expenses, including court costs and reasonable attorney's fees, arising out of, or resulting from, Lan Global]'s performance, non-performance or breach of this Agreement, including any causes of action based upon common, constitutional, or statutory law, or based in whole or in part, upon allegations of negligent or intentional acts on the part of [Lan Global] . . . .

[Dkt. 85-13 at ¶ 13].

15

Lan Global proposes a contorted interpretation of the language that would distinguish between actual and direct claims, and divide direct claims into (a) personal injury and (b) property damages, losses and expenses.  [Dkt. 135 at 10-11].  Essentially, Lan Global asserts that the MPA only requires that Lan Global indemnify Alchemy against:

1. Actual Claims; and

2. Direct Claims (based upon common, constitutional, or statutory law, or negligent or intentional acts),

    a. Related to injuries to persons (including death); or

    b. Property damages, losses and expenses, including court costs and reasonable attorney's fees; which

        i. Arise out of, or result from, Lan Global's performance, non-performance or breach of this Agreement.

This reading is unsupported by accepted forms of contract construction.  As Judge Levenson explained, the plain and ordinary meaning of this clause is that Lan Global will indemnify Alchemy for "claims . . . related to injuries to persons (including death), property damages, losses, and expenses . . . arising out of, or resulting from, [Lan Global]'s performance, nonperformance or breach" of the MPA.  [Dkt. 85-13 at ¶ 13].  The oxford comma ahead of the word "and" makes clear that Lan Global is responsible for:

1. Actual Claims; and

2. Direct Claims

    a. Arising out of or resulting from Lan Global's performance, non-performance or breach of this Agreement; and including court costs and attorney's fees;

        i. Related to injuries to persons (including death); or

        ii. Property damages; or

        iii. Losses; or

        iv. Expenses

Lan Global's construction would imbue some commas with more import than others, a distinction that is more self-serving than plausible.

However, Lan Global correctly points out that the indemnity clause requires Lan Global to indemnify Alchemy "<u>against</u> all actual and alleged claims" without mention of Lan Global's responsibility for claims pursued by Alchemy.  [<u>Id.</u> (emphasis added)].  Indeed, elsewhere the MPA contemplates that Alchemy could pursue legal action against Lan Global in the event of a breach, but it does not stipulate that Lan Global would be responsible for its legal fees.  [<u>Id.</u> at ¶ 6].  According to the plain meaning of the clause, Lan Global is required to indemnify Alchemy for costs incurred in its defense but not for costs incurred while prosecuting its claims.

As this motion was only as to liability, the costs borne by each party shall be determined at a later stage.

Accordingly, the Court **ADOPTS** Judge Levenson's recommendation and **GRANTS** Alchemy's Motion for Indemnification as to expenses incurred in its own defense but **DENIES** the Motion as to expenses incurred in the prosecution of its claims.

### B.      Summary Judgment on Lan Global's Claims

Lan Global's claims of breach of the implied covenant of good faith and fair dealing (Count V) and unjust enrichment (Count III) are grounded in equity and turn on the subjective expectations of the parties.  However, as already discussed, the MPA is not ambiguous, therefore evidence of the parties' beliefs is not admissible.

For the reasons that follow, the Court agrees with Judge Levenson's findings and conclusions of law and therefore **ADOPTS** his recommendation to **GRANT** Alchemy's Motion for Summary Judgment as to Lan Global's remaining claims.

1.   Breach of the Implied Covenant of Good Faith and Fair Dealing

Lan Global submits that Alchemy breached the implied covenant of good faith and fair

dealing when it failed to provide Lan Global with devices meeting the expected mix of Grades.

"Under Massachusetts law, every contract implies good faith and fair dealing between the parties

to it." Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (quotations, citation

and punctuation omitted).  "[T]he parties to a contract implicitly agree 'to deal honestly and in

good faith in both the performance and enforcement of the terms of their contract.'" Biltcliffe v.

CitiMortgage, Inc., 952 F. Supp. 2d 371, 381 (D. Mass. 2013) (quoting Hawthorne's, Inc. v.

Warrenton Realty, Inc., 414 Mass. 200, 211, 606 N.E.2d 908, 914 (1993)).  Thus, "the purpose

of the covenant is to guarantee that the parties remain faithful to the intended and agreed

expectations of the parties in their performance." Id. (alteration omitted) (quoting Uno Rests.,

Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004)).

"A breach [of the covenant of good faith and fair dealing] occurs when one party violates

the reasonable expectations of the other." Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82, 12

N.E.3d 354, 362 (2014)) (quotations and citations omitted).  "There is no requirement that bad

faith be shown; instead, the plaintiff has the burden of proving a lack of good faith." Robert &

Ardis James Found. v. Meyers, 474 Mass. 181, 189, 48 N.E.3d 442, 450 (2016) (quoting Weiler,

469 Mass. at 82, 12 N.E.3d at 362) (additional citations omitted).  "However, '[t]he scope of the

covenant is only as broad as the contract that governs the particular relationship.'" Id. (quoting

Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, 822 N.E.2d 667, 684, (2005)).

Even construing the evidence in the light most favorable to Lan Global, no evidence has

been produced to show that Alchemy did not act in good faith.  Lan Global was understandably

frustrated with the mix of device Grades it was receiving, but there is no evidence that Alchemy

intentionally procured or sold a disproportionate number of Grade C devices to Lan Global. As previously explained, the MPA did not require Alchemy to provide Lan Global with a specific mix of Grades; and, even if Lan Global believed and expected that Alchemy would provide them with an even mix, those subjective beliefs are immaterial, barring evidence that Alchemy acted with a lack of good faith. See Robert & Ardis James, 474 Mass. at 189. As Judge Levenson succinctly put it, "Lan Global's grievance is with the terms of the MPA, not with any bad faith performance on Alchemy's part." [Dkt. 130 at 21].

Accordingly, the Court **ADOPTS** Judge Levenson's recommendation and **GRANTS** Alchemy's Motion for Summary Judgment as to Lan Global's claim for breach of the implied covenant of good faith and fair dealing (Count V).

### 2.    Unjust Enrichment

Lan Global contends that Alchemy's association with Lan Global augmented Alchemy's standing with Apple, and therefore Lan Global is owed a portion of Alchemy's profits derived from its relationship with Apple.

To prove a claim for unjust enrichment, a plaintiff must show "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." Tomasella v. Nestle USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009)). Unjust enrichment is "an equitable remedy, and it is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law." Foley v. Yacht Mgmt. Grp., 2011 WL 4020835, at *8 (D. Mass. Sept. 9, 2011) (internal quotation marks and citation omitted) (quoting Massachusetts v.

Mylan Laboratories, 357 F. Supp .2d 314, 324 (D. Mass. 2005)).  "[T]he existence of a contractual relationship between the parties typically precludes an unjust enrichment claim arising out of that contract."  Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 931 (1st Cir. 2014).

Judge Levenson engaged in a thorough analysis of why Lan Global's claim fails, explaining that restitution cannot be awarded for an allegedly ill-gotten reputational benefit and pointing out that testimony regarding Alchemy's gratitude toward Lan Global for getting Alchemy "a chair at the table" occurred before the parties entered into the MPA.  [Dkt. 130 at 22-23].

Simply put, Lan Global's unjust enrichment claim is based upon its dissatisfaction with Alchemy's performance under the MPA, therefore its claim is precluded.  "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment."  Plastic Surgery Assocs., S.C. v. Cynosure, Inc., 407 F. Supp. 3d 59, 83 (D. Mass. 2019) (quoting Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006)).  "It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment."  Id. (quoting Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017)).

Alchemy did not breach the MPA.  If Lan Global wanted compensation for any reputational benefit Alchemy received as a result of their collaboration, it could have negotiated for such terms to be included in the MPA.

Accordingly, the Court **ADOPTS** Judge Levenson's recommendation and **GRANTS** Alchemy's Motion for Summary Judgment as to Lan Global's claim for unjust enrichment (Count III).

C.      **Alchemy's Motion to Strike**

Alchemy moves to strike two expert opinions submitted by Lan Global in support of its Opposition to Alchemy's Motion for Summary Judgment, that of Mr. Luna, a lawyer and accountant who has calculated Lan Global's damages, and Dr. Phiroz, a professor of business who has submitted an expert opinion on supply chain economics as they relate to this case. [Dkt. 88].

For the reasons that follow, the Court agrees with Judge Levenson's findings and conclusions of law as to Mr. Luna, but respectfully disagrees as to Dr. Phiroz.  The Court therefore **ADOPTS** Judge Levenson's recommendation to **DENY** the Motion as to Mr. Luna that neither party objects to but also **DENIES** the Motion as to Dr. Phiroz.

1.      <u>Mr. Luna</u>

As explained by Judge Levenson, Mr. Luna is competent to perform the calculations requested of him.  [<u>See</u> Dkt. 130 at 32].  Whether the assumptions given to him as the basis for his calculations are flawed will be a fact question reserved for trial.  As the recommendation to allow Mr. Luna's testimony has not been objected to, the analysis ends here.

2.      <u>Dr. Phiroz</u>

Dr. Phiroz is an expert in supply chain principles.  Consistent with this Memorandum and Order, the Motion to Strike is granted to the extent Dr. Phiroz's testimony bears on the expectations of the parties.  To the extent Dr. Phiroz's testimony is relevant to permissible lines of inquiry, it is allowed, barely.

Alchemy avers, and Judge Levenson agreed, that Dr. Phiroz's opinion is irrelevant to the remaining claims and defenses and that the opinion fails to reliably apply expert methods to the facts.

21

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  See Crowe v. Marchand, 506 F.3d 13, 17 (1st Cir. 2007) (describing Rule 702 as "[t]he touchstone for the admission of expert testimony").  Under that Rule, a qualified expert

> may testify in the form of an opinion or otherwise if: (a) the expert's . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  These requirements impose upon the trial judge a "gatekeeping role[,] . . . ensur[ing] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  López-Ramírez v. Toledo-González, 32 F.4th 87, 94 (1st Cir. 2022) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).

Dr. Phiroz holds a PhD from the University of Cape Town's Graduate School of Business and wrote his dissertation on issues concerning "supply chain management."  [See Dkt. 89-1 at 25–27].  Having held faculty appointments at UCSD, Harvard University, UCLA, and University of Southern California, Dr. Phiroz is currently a professor at the Rady School of Management at the University of California, San Diego, where he teaches courses in operations management and supply chain analytics.  In the private sector, Dr. Phiroz has held senior appointments at TELUS and Procter & Gamble and is a founding partner of Pier Consulting Group.  In particular, Dr. Phiroz has devoted his study and work to the quantification and optimization of supply chain coordination.  As Judge Levenson concluded, "[b]ased on these credentials, Dr. Phiroz plainly holds expertise in the academic discipline of 'supply chain management.'"  [Dkt. 130 at 37].

In his opinion, Dr. Phiroz describes how supply chain management comprises one of the competitive strategies employed by companies to enhance productivity and profitability.  [Dkt. 89-1 at 8].  He explains how each link, or "node" in the supply chain is responsible "for ensuring

products provided meet the expectations and requirements of the supply chain." [Id. at 9]. Dr. Phiroz discusses how the lack of communication between and within nodes leads to a breakdown of the supply chain, [id. at 9-22], and then applies that methodology to analyze the parties' relationship and responsibilities, [id. at 10-22].

Judge Levenson concluded that Dr. Phiroz's opinion was based on generalities about supply chain principles and best practices rather than a scientific application of principle to fact. While that conclusion is not unreasonable, the Court will grant Plaintiff and Dr. Phiroz some latitude. While Dr. Phiroz's testimony is certainly not admissible as it pertains to the expectations of the parties, it might have some bearing on Lan Global's affirmative defense of failure to mitigate damages. Industry standards in that regard might well be illustrative.

As it stands, at this stage the Court declines to take the extreme measure of striking Dr. Phiroz's testimony in its entirety but will not admit any testimony that is only relevant to issues that have already been deemed inadmissible. The Court is open to revisiting the question of the relevance and rigor of Dr. Phiroz's testimony at trial, if necessary. Plaintiff may reassess the value in presenting paid expert testimony when that evidence is likely to have minimal effect on the outcome.

## IV.  CONCLUSION

For the foregoing reasons, this Court **ADOPTS IN PART** Judge Levenson's Report and Recommendation, [Dkt. 130], and (1) **GRANTS** Alchemy's Partial Motion for Summary Judgment, [Dkt. 82], except Lan Global shall not be responsible for Alchemy's costs incurred while prosecuting its own claims; and (2) **DENIES** Alchemy's Motion to Strike the testimony of Lan Global's proposed experts, Mr. Luna and Dr. Phiroz, [Dkt. 87].

**SO ORDERED.**

Dated: September 26, 2024

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge